## LAWRENCE LEE SHULTS, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 10848

September 5, 1980                    616 P.2d 388

*Morgan D. Harris,* Public Defender, and *Terrence Jackson,* Deputy Public Defender, Clark County, for Appellant.

*Richard H. Bryan,* Attorney General, Carson City; *Robert J. Miller,* District Attorney, *James Tufteland* and *Gregory C. Diamond,* Deputy District Attorneys, Clark County, for Respondent.

## OPINION

By the Court, MANOUKIAN, J.:

On January 3, 1978, a jury found appellant guilty of murder in the first degree. Thereafter, the trial judge sentenced him to life without the possibility of parole. The evidence is not challenged as insufficient. In this appeal, appellant contends that the trial court erred: (1) by allowing admission of testimony of a peace officer as to conversations with appellant's wife; (2) by admitting evidence of details of a robbery by appellant; (3) by admitting evidence of escapes by appellant; and (4) by admitting hearsay statements of the victim. We affirm.

On October 21, 1975, the decomposed body of a white male adult was discovered in a shallow rock-covered grave off of state highway 52 near Las Vegas. Appellant was indicted by a grand jury for the murder of William Harvey Singley and, in

October of 1976, was extradited from Colorado where he was serving a twenty-year sentence for armed robbery.

At trial, a Detective Aldrich of Colorado Springs testified that, in May of 1975, appellant Shults and his wife, Norma, had been arrested along with Singley and a George Janicek for the robbery of a Montgomery Ward store in Colorado. During appellant's preliminary hearing in Colorado, appellant learned that the victim in this case, William Singley, was the source of information regarding particular details about the robbery. Approximately one month later, on July 17, 1975, Singley agreed to testify at appellant's trial on the robbery charge in exchange for a reduced charge to which he pled guilty.[1] Detective Aldrich then testified that on October 20, 1975, he met with his division chief and with Norma Shults in Colorado. After this meeting, Aldrich placed a telephone call to the Las Vegas Metropolitan Police Department at which time he informed Lieutenant Avants that he had information that there was a homicide victim located in the desert near Mt. Charleston.

Colorado Springs Detective Andrew Smit testified as to his May 17, 1975 interview with Singley. Detective Smit was told by Singley that he was afraid that appellant would kill him if Singley provided information in connection with appellant's involvement in the Montgomery Ward robbery. Another witness, Robert Howard, testified that in late July of 1975 the victim, William Singley, acted worried about something. The witness stated that Singley was afraid that someone was going to "waste" him although he did not say who. The witness then stated that he had loaned his 1974 blue Pinto to the victim. The vehicle was not returned and the witness never saw Singley again. In the latter part of August, Howard received information that his car was in Las Vegas. Over the labor day weekend, Howard retrieved his automobile and discovered that a blanket was missing, as well as the blue carpet which had covered the spare tire compartment. Shotgun shells were found in the back of the car. Howard then identified the blanket which had been found around the victim as the one missing from his car.

Several witnesses testified that appellant had admitted killing Singley. One witness, Edmund Friedrich, testified that he had been told by appellant that appellant had shot the victim twice and then buried him in a rock grave. Appellant stated that he had returned to the grave shortly thereafter to make sure that the body was buried. Vickie Ritter testified that appellant had told her that he had killed Singley and that Janicek was next. Mary Kay Fuller testified that she had talked to appellant just

---

[1]Singley did not testify at the robbery trial.

after the fourth of July in 1975. At the time, appellant stated that he was mad at Singley and Janicek because they were going to testify against appellant as to the robbery. In late July, Ms. Fuller saw appellant and the victim together. On this occasion, Ms. Fuller loaned her pickup to the two men in exchange for a blue Pinto the two men had been driving. The pickup contained a .12 gauge shotgun belonging to Ms. Fuller's husband. The next day, on July 29, Ms. Fuller had reacquired possession of her pickup and noticed that the shotgun was missing. Ms. Fuller asked appellant where the shotgun was and appellant said, "Don't worry about it, it's out in Nevada." Appellant said it was "too hot" to bring back at that time. When Ms. Fuller asked about the victim, appellant said, "Don't worry about it, you'll never see him again."

A resident police officer of the Mt. Charleston area near Las Vegas testified that, in October of 1975, he had spoken with Mrs. Shults who was in Colorado Springs. Without testifying as to what Mrs. Shults had told him, Officer Woodworth stated that he subsequently went to a desert area and discovered the victim's grave.

The Clark County Coroner testified that he had concluded from an examination of the remains that death had resulted from a shotgun wound to the head of the victim and that there had also been a wound in the left shoulder. A Colorado dentist had testified that he had extracted a tooth from the victim in April of 1975. Subsequent medical testimony matched the dental cavity of the body discovered in the desert with that of Singley.

### 1. The Marital Privilege and Hearsay Claims.

Colorado Springs Detective Aldrich testified that he talked with Norma Shults. He then called Las Vegas police informing them that he had information regarding a homicide victim and directed Las Vegas police to a location he had been given. Officer Woodworth testified that he talked with Norma Shults by telephone and consequently directed the search for the body to a different area. Aldrich stated that he listened to Norma Shults as she talked to Officer Woodworth. At trial neither officer testified as to the content of Mrs. Shults' statement.

In Nevada, a wife "cannot be examined as a witness for or against" her husband without the consent of the husband nor can a wife be examined without the consent of the husband "as to any communication made by one to the other during marriage." NRS 49.295(1). Appellant contends that the testimony by the officers violated the marital privilege statute. We first

note that appellant's wife was not a witness at trial. Thus, she was not actually "examined" as contemplated by the statute. *See* Metz v. State, 262 A.2d 331, 333–34 (Md.App. 1970). Moreover, we cannot say that the testimony by the officers revealed any privileged communication between appellant and his wife. On this record, it is impossible to determine whether Mrs. Shults made a statement as to the body's location, whether she was present during the burial, whether others in addition to appellant were present at the scene, or whether, in fact, confidentiality was contemplated. It would be mere speculation to say that she acquired what knowledge she had from a communication with appellant. We do not find a violation of the marital privilege statutes.[2] *Compare* Deutscher v. State, 95 Nev. 669, 601 P.2d 407 (1979) (testimony by officer as to comments by appellant's wife did not violate privilege) *and* Grundstrom v. State, 456 S.W.2d 92 (Tex.Crim.App. 1970) (wife did not testify as to a communication by giving physical evidence to police in response to question by officer) *with* State v. Suits, 251 S.E.2d 607 (N.C. 1979) (officer could not testify as to wife's conduct in response to questions asked of her).

■■■■■■■

Appellant next contends that the testimony by the officers improperly circumvented the hearsay rule. Of course, out of court statements by appellant's wife would be inadmissible hearsay if offered for the truth of the matter asserted. Deutscher v. State, 95 Nev. at 683–84, 601 P.2d at 417. Although the officers revealed no statements made by Mrs. Shults, appellant argues that the inference was that she told the officers that she knew where the body was and that appellant placed it there or had some connection with it. The state asserts that the results of the conversation with Mrs. Shults were not offered to prove the truth of any matter but only to explain the conduct of the searchers.

■■■■■■■

Here, the officers did not reveal any particular statements made by Mrs. Shults. The results of the conversation with appellant's wife were offered only to explain the resulting conduct of the police. After testifying that a conversation took place, the witnesses simply testified as to what occurred thereafter, not to out of court statements of another. The witnesses were subject to cross-examination as to the existence of these

---

[2]We are not prepared to expand the marital privilege beyond the language of the statute and thereby exclude what may be relevant evidence. *See* Trammel v. United States, 445 U.S. 40, 100 S.Ct. 906 (1980).

facts. Such is not violative of the hearsay rule. Enlow v. United States, 239 F.2d 887, 890 (10th Cir. 1957).

2.   *The Details of the Robbery.*

The general rule with regard to character evidence is that evidence of other crimes or bad acts is inadmissible to prove the character of a person in order to show he acted in conformity with such character. NRS 48.045(2). But such evidence is admissible if relevant for some purpose other than to show an accused's criminal character and the probability that he committed the crime. McMichael v. State, 94 Nev. 184, 188, 577 P.2d 398, 400 (1978). Motive, intent, plan, and identity are some of the objectives for which such evidence may be admitted. NRS 48.045(2). This evidence must nevertheless be limited according to prejudicial effect. NRS 48.035.

Detective Aldrich testified that the victim had cooperated and implicated himself and appellant in the Colorado robbery. This was used to establish appellant's motive for the subsequent killing. Aldrich was then allowed to testify as to the details of the robbery. The state was permitted to show that appellant planned the robbery, gave orders and divided the money. The state argues that because this case is wholly circumstantial, it was important to show motive and therefore the details of the robbery. Bails v. State, 92 Nev. 95, 99, 545 P.2d 1155, 1157–58 (1976).

Evidence of other crimes committed by a criminal defendant is generally excluded due to its highly prejudicial effect. A defendant should not have to defend against charges for which he is not on trial. *See* People v. Schader, 457 P.2d 841, 847–48 (Cal. 1969). Thus, when evidence of prior crimes is relevant and admissible, the trial court should cautiously weigh the probative value against the bias or prejudice likely to result. McMichael v. State, 94 Nev. at 190, 577 P.2d at 401–02. It is for this reason that we have held that, although a witness may be impeached with evidence of prior convictions, NRS 50.595, "[t]he details and circumstances of the prior crimes are, of course, not appropriate subjects of inquiry." Plunkett v. State, 84 Nev. 145, 147, 437 P.2d 92, 93 (1968). In most instances, this rule should be applied to character evidence.

We have also held that the prosecution is entitled to present "a full and accurate account" of the circumstances surrounding a crime. Dutton v. State, 94 Nev. 461, 464, 581 P.2d 856,

858 (1978). Nevertheless, the evidence must be relevant and necessary in the presentation of the case, especially when the evidence implicates the defendant in the commission of other crimes or only tends to prove a bad character. In the present case, although motive could have been established by showing that the robbery was committed, that the victim cooperated with the police in implicating appellant, and that appellant was aware of the victim's cooperation, the trial court determined that the fact that appellant planned the robbery, gave the orders, and actually carried out the crime was relevant to demonstrating motive. The trial court carefully scrutinized the evidence it allowed to show motive, and balanced prejudice and probative value, a decision addressed to its sound discretion. NRS 48.035. There was no abuse of discretion.

### 3. Evidence of Escapes of Appellant.

Appellant contends that the trial court erred in admitting evidence of appellant's escapes. A correctional officer, Elbert Crowe, testified that appellant escaped from the county jail on April 16, 1977. Agent John Kazystyniak of the FBI had previously testified that appellant was apprehended in New York on May 11, 1977 after the escape. Appellant admitted the fact of his escape to the agent. Finally, a Las Vegas Police Officer testified that appellant was also apprehended on November 4, 1977. There was no direct evidence that appellant had escaped a second time although this was the inference. The contention here is that an inference of guilt on the murder charge could not be drawn as appellant was in jail on a robbery conviction and was facing a burglary charge. Appellant concedes that flight is admissible as an indication of consciousness of guilt. Edwards v. State, 90 Nev. 255, 260, 524 P.2d 328, 332 (1974); Williams v. State, 85 Nev. 169, 175, 451 P.2d 848, 852 (1969). And a majority of jurisdictions have held that, provided the jury is properly instructed, evidence of flight may be taken into consideration even though two or more charges are pending. See People v. Nieman, 232 N.E.2d 805 (Ill.App. 1967); State v. Tyler, 306 S.W.2d 452 (Mo. 1957); People v. Yazum, 196 N.E.2d 263 (N.Y. 1963).

The jury was properly instructed that evidence of escape "may be considered by you in the light of all other proven facts" in deciding guilt and that whether this indicated consciousness of guilt was left for their determination. Appellant contends that the court should have instructed the jury that other facts would include "whether or not he was in custody on another charge." Considering the fact that counsel for appellant argued in closing that appellant had been in jail for the

robbery conviction, we believe that the instruction given was sufficient. Nevertheless, we conclude that the better practice would be to include a reference to the fact that a defendant was in custody on other charges if that is a properly proven fact. On this record, we perceive no error.

4. *Admission of Statements by the Victim.*

Detective Smit testified during redirect examination as to statements made to him by the victim, Singley. Singley had said "that he was afraid that if he told on [appellant] on the Montgomery Ward robbery, that [appellant] would kill him." Robert Howard later testified that, on an outing with Singley, Howard was told by Singley "that somebody was going to waste him."

The trial court permitted Smit's testimony stating that defense counsel had opened the door as to fear by the victim. But the fear to which defense counsel had alluded regarded Singley's fear about being a witness in a case in Virginia. The state had not objected to the testimony. The trial court allowed Howard's testimony stating that there was sufficient corroboration of the conversation under NRS 48.064.[3] The admission of these statements constituted error.

This court has allowed hearsay statements of a victim in a criminal case when such statements were corroborated under NRS 48.064. Bails v. State, 92 Nev. at 100, 545 P.2d at 1158. But there the victim had mentioned a two-dollar bill collection, appellant was seen with two such bills on the day of the homicide, and the victim's collection and failure to place it in a safe deposit box was corroborated by other witnesses. In the instant case, the hearsay testimony relates to the victim's fear of appellant and the state argues that each statement independently corroborates the other thereby making them admissible under NRS 48.064. We cannot agree.

We have recently held that, in a pandering prosecution under NRS 201.300, "[w]itnesses whose testimony requires corroboration may not corroborate each other." Sheriff v. Gordon, 96 Nev. 205, 206, 606 P.2d 533, 534 (1980). In that case, the victim's testimony required corroboration under NRS 175.301 and the accomplice's testimony required corroboration under

---

[3]At the time of trial, NRS 48.064 provided, "Transactions or conversations with or actions of a deceased person are admissible if supported by corroborative evidence." This statute has been repealed. 1979 Nev. Stats. ch. 134, at 198.

NRS 175.291. We believe that a similar holding is required in the present case where there is a real danger of unreliability and due to the fact that a victim's statement of his fear of a defendant is so injurious.

Moreover, the state of mind hearsay exception under NRS 51.105(1) gives no solace to the state. First, the victim's state of mind was not in issue. Appellant was not claiming self-defense, accidental death or suicide. As such, the statement had little relevancy except toward providing the strong inference of appellant's intent, actions or culpability. *See* United States v. Brown, 490 F.2d 758, 766 (D.C.Cir. 1974). In order for the state of mind exception to be applicable, the victim's state of mind must be a relevant issue, the relevance must be weighed against prejudice, and a proper limiting instruction must be given or objectionable testimony deleted. *Id.* at 773–78. *See* People v. Lew, 441 P.2d 942 (Cal. 1968). Although appellant offered no limiting instruction, the potential damage incidental to the testimony and the fact that an objection was made warrant our consideration of the issue as plain error. NRS 178.602. Although the trial court erred in receiving this evidence, the evidence of guilt in the instant case is incredibly strong. Indeed, it is overwhelming. *See* Abram v. State, 95 Nev. 352, 356, 594 P.2d 1143, 1145 (1979). We conclude that the error in admitting the complained of declarations did not effect the substantial rights of the appellant. *See* NRS 177.255.

The remaining contentions are without merit. The judgment of the district court is affirmed.

Mowbray, C. J., and Thompson, Gunderson, and Batjer, JJ., concur.